Your Honor, this is the third case of the morning. Call 211-0729 Bank of America N.A. v. Bassman FBT LLC. On behalf of the F. Lawrence Bassman P.F. of PBT, Mr. Kenneth Dashman. On behalf of the F. Lee Bank of America N.A., Mr. David Lynch. Now, Mr. Dashman, are you ready to proceed? I am, Your Honor. Please step forward. Good morning. Names of the court, I'm Kenneth J. Dashman. I represent the appellants in this case. With me is Kyle C. He's a first-year associate. He's winning his first appellate argument today. An old law school professor told me years ago that the law generally tries to do what's right. And it's not always easy to ascertain that. But that's not only the goal, but if you're trying to figure out what the answer is to a particular legal question, think about what is the right answer. What should the law be? And that generally is what the law commands, what the law says it is. There's something odd about a party that has no rights to property. Affecting or depriving a party that does have rights to property with a party that has rights has no say in it whatsoever. Can't even raise an issue, can't offer a defense that the party that has no rights has no rights. Can't be heard on the issue. And that's what plaintiff is suggesting here. Plaintiff is saying that even if there's not a proper assignment to the trust in this case, or even if the assignment is void as a matter of law, that if the mortgages at issue are not part of the property of the case, the mortgage owner has no say, can't even raise the issue about whether it's proper. Are they really saying that, or is it in fact one of the overarching themes in this case, was the transaction termed void or voidable under the law? Because it is generally true, I think, as you know, that usually a debtor can't assert certain defenses that render assignments invalid unless they are a party to it or a third-party beneficiary. Unless it's void, then of course it can be challenged at any time. So there is a little, I think, distinction between a void act and a voidable act as to whether or not the debtor has the right to challenge the transaction. I don't think that's so novel, is it? No, I agree with you, but that's not their position. All I'm suggesting is what they're saying. They're saying in their papers it makes no difference. And, more importantly, we can't even be heard on it. We can't offer an argument. We have no standing to even mention that argument. Well, that will be obviously for us to decide. But let me ask you an important threshold question that bears on this issue. Which state's law, in your opinion, controls the question of whether the mortgages were validly conveyed to the trust? New York law. Okay, and that's because of the choice of law provision in the PSA itself, correct? Not only because of that, but also because it's a New York trust, and therefore New York law governs New York trust. The issues are whether there was a valid assignment under the PSA, and since it's a New York trust, New York law would govern the trust. What is the authority of a trustee of a New York trust independent of the PSA? It's a New York trust for those two reasons. Now, in their papers, they don't really offer an explanation of why they feel that Illinois law governs. I presume, although I don't want to make their arguments, I presume it's because the mortgage issue and the noted issue say that it's governed by Illinois law. Right, but that should be the parties. I think under the agreement it's governed under Illinois law. The validity of the conveyance is under New York, at least as I read it by the PSA agreement and the other principles you cited. Let me ask you this. Does this case turn on whether or not the conveyance, this court determines if the conveyance is void or voidable? I mean, you're saying, you're alluding to their argument it doesn't make any difference. You've got an outstanding at any time. But what about whether or not it's void or voidable? Does that make a difference in the outcome? Well, certainly if it's void, there's a difference in the outcome. You can challenge it, obviously. Right, and that's our position. I mean, as to whether it's voidable, I never really reached that issue. The court gave three great questions that I'm prepared to talk about today. The last question of the three asked about a difference between an imperfect conveyance and a failed conveyance and then led into the question about whether each was void or voidable. What we have here is a situation where there's either authority or there's no authority. Under the PSA, the trustee did not have the authority to accept the margins into the trust. That's clear. The limitations from the PSA on the trustee said you could only accept into the trust if it follows the terms of the PSA. And you can't do it otherwise. But nevertheless, they did it. Well, and so there's a limitation of authority there, okay? Then, in addition, New York law provides that any action of a trustee that is in contravention of the terms creating the trust, such as accepting a mortgage that wasn't permissible under the trust document, under the PSA, is void. So there is no situation here that talks about an imperfect conveyance. An imperfect conveyance in this situation is a failed conveyance. They're one and the same. You can't be a little bit pregnant. You either have the authority to do something or you don't. And the trustee here didn't have the authority on two different bases in order to accept the mortgages into the property. And as a result, it's void. So I never got to the question, is it voidable, because it's void. Part of the reason you're saying it's void is because the New York statute, which we've looked at, on its face would indicate that it would be void. However, we uncovered substantial authority that contradicts that. There are some New York cases that would indicate that this conveyance is voidable, not void, and that it can be ratified by the beneficiaries. Well, even if that's true, it wasn't done here. And according to the PSA, the trustee can only accept a property via ratification if it's accompanied by a letter of counsel suggesting that there's some sort of qualifications. There's a number of hoops that the trustee has to go through in order to provide ratification, according to the PSA itself. And I can provide you with the exact citation of that, but it is in our papers. Well, do we have enough information in this record to indicate that those hoops were not jumped through? Yes. I mean, it's hard to prove a negative, but they did not occur. It's their burden to show if something did occur, and there's no fact. So you're saying in reality it isn't, but the record is not really clear. It's sort of silent on whether or not that happened. It never got developed below, did it, whether or not there was a ratification? There – I took the – This is a summary judgment. This is a summary judgment action, correct? Correct. There's no evidence in the record that that occurred. And I believe when I took Ms. Boland's deposition, it's a pretty long, thick deposition. I don't remember every question. It was quite a while ago. I can't say with certainty whether that was addressed or not, but it didn't happen. They didn't – they would have raised that issue. They would have said, hey, we've complied with it, it was ratified. Well, maybe they would have raised the issue, but that's not the problem here. The record is – there's nothing in the record to support that it did happen. That's for sure. There's no evidence in the record that that happened. And I think the reason why is because it actually didn't happen. What about the law? We were to conclude the law is an act to be ratified. This case law says it would be voidable rather than void. So, taking it further, what if it was never ratified? Does that mean that it could not be voidable? Well, in this particular case, if it wasn't what would be before the court – in other words, assuming that the New York law governs, as you're postulating, that's – it could only – that it only is voidable if it's remedied by a subsequent ratification. The court would have to reverse the decision of the circuit court in this case because there's no evidence in the record that it was ratified. Well, here's what I'm saying, though. Maybe this is being too subtle. If we conclude New York law has applied the rule that a beneficiary can, quote-unquote, can ratify an ultra-virus act, let's say, was what you're suggesting. There was no authority to do that. Well, if you can ratify an act, then it couldn't be a void act because you can't ratify a void act, correct? Well, I'm not sure what law you're referring to with respect to – I'm referring to New York law. There's a number of cases here that I can – But, I mean, the statute itself says it's void. So what you're suggesting is that the New York cases that you're referring to is doing the exact same thing you're saying couldn't happen, which is to say a statute says it's void, but it's – Well, I'm saying the case law interpreting – and this is unusual – interpreting the statute interprets it a little bit differently than what the statute ostensibly says. I mean, that's not so novel, is it? I mean, that does happen. Well, again, it wasn't in their paper, so I'm not – I can't argue those cases because I haven't – other than to say on logic alone, the statute says it's void. If the case law interpreting says that it's ratifiable and therefore not voidable, then I can't get to that issue 100 percent. I apologize. But my own view is that the statute says it's void, and even if it's ratifiable, it wouldn't make a difference in this case. The court would still have to reverse. Now, maybe later on they could go back and ratify and do what they want to do and refile and do whatever they need to do in order to fix it. And we'd have to reverse why? You'd have to reverse because it is void as of now. It is right now not something that's part of the trust. The mortgages at issue are not part of the res, and the trustee cannot enforce anything that's not part of the trust. It's enforcing a mortgage that's outside of what it controls. And until that's changed, they don't have a stand. So the court would have to, you know, if it even – that's how it presently sits. So if they ratified it and fixed it later and somehow got it in there, I don't know. That might be a different factual situation. It's not for the court. I wanted to address, I mean, some of the other questions that you raised. And I think I threw a little conversation right here, hit on most of them actually. But I did want to explain that even if Illinois law were to govern, the outcome would not be different. Now, it's not as strong as the statute, but nonetheless, the outcome would be the same. It's for two reasons. First, both Illinois law and New York law enforce trust agreements that limit the authority of a trustee. What's the reason for that? Well, because – Other than it's the plain word, what's the – is there a bigger policy issue? Well, yeah. I mean, you know, trusts are a creation of state law, just like a corporation is. And there's ultra-various acts of a corporation and corporate authority, just like there's ultra-various acts of a trust. So anytime the state is creating an entity or a power, it's going to be – it's going to have the power to determine its scope, the breadth of the authority of the entity that it's creating. So Illinois law and New York law, and I think probably all other laws, say that we'll permit trust to exist, and we will also enforce the right of the settler to determine how broad or how narrow the scope of the trust ought to be. So, for example, in a case decided by the Illinois Supreme Court in 2009, a state offender, the court said as follows. Under the Trusts and Trustees Act, a person establishing a trust may specify in the instruments the rights, powers, duties, limitations, and immunities applicable to the trustee, beneficiary, and others, and those provisions are not otherwise contrary to law shall control notwithstanding the act. Thus, the legislature intended that the settler of a trust have the freedom to direct his bounty as he sees fit, even to the point of giving effect to a provision regarding the rights of beneficiaries that might depart from the standard provisions of the act, unless otherwise contrary to law. So Illinois law and New York law both enforce the idea that limitations on a trustee's authority are enforceable and valid. Counsel, let me move ahead because I think the choice of law provision in the contract is fairly controlling, but you've alleged that there's breaches of the PSA by the plaintiff preclude summary judgment. Correct. The threshold question I have for you is generally only parties or third-party beneficiaries are entitled to assert rights created by a contract. So how do you qualify as a beneficiary or third-party beneficiary under the PSA that you are not a party to? Because the Illinois law, Illinois courts do not blindly follow language of a contract saying that there is not supposed to be an intended beneficiary. They look to the reality of the situation. And in the PSA, there are provisions that say when a borrower or mortgagor is in trouble and it goes to what they call a special servicing, there are certain steps that have to take place, including trying to work it out in good faith, et cetera, that clearly benefit the mortgagor. And so the boilerplate language that says that it's not for the benefit of a third party doesn't control. You look to whether there really is an intended benefit to a third party. And here, that's clear that there are. There are a number of provisions there that give these benefits. And in fact, if I may, there is an interesting case that talks directly to this point. It's from the Seventh Circuit, but it doesn't apply to Illinois law. And there it's found that third-party plaintiffs have stated a valid third-party beneficiary claim, despite the existence of a contractual provision stating nothing here is intended to create any third-party benefit. The court found that the provision was ambiguous in light of a separate provision which clearly conferred an intended benefit on the third party. That's why summary judgment is precluded, because it's a genuine issue of material fact as to whether my client is an intended third-party beneficiary in the PSA. What are the benefits that your client is getting from this process? I mean, you say there are obvious benefits being conveyed upon your client by this transaction. What are they? The benefits, there's, when my client, my client intentionally went into default because after a number of years of making payments, because it saw that its occupancy rate was dropping. And as a result, it contacted who it thought was its lender or the service provider and said, we need to try to work it out. They were told, and it's all on the record, that we won't even have a conversation with you until you're three payments in arrears. Right, three or four, right. Right, so you're three payments in arrears, and part of the PSA says that when that happens, there's an obligation on the part of the service provider to try to work it out, not just file a lawsuit, to try to work it out and to try a modification, et cetera. Can't there be an attempt to work it out, as it were, after litigation is filed? No, because the PSA specifically says that it's a last resort. And Cecilia Boland, who's the primary party involved on behalf of the service, attested to that as well. So you have to go through these things first. And factually, what happened was it didn't occur. While they were talking, they filed suit, and this is all part of the record. But as a result, there's a whole bunch of provisions in there that go to the, that benefit a borrower who's in trouble without having to face immediate litigation. And that wasn't followed, and that's why there's a, they have certain rights under the PSA. And because they weren't given those particular rights, your position is that they then have the right to challenge how this all came about? It's a condition proceeding to filing suit, and it wasn't followed. And so they have a right to enforce that. Do you have any questions? No. All right. You'll have time for rebuttal, counsel. Thank you. Thank you. Mr. Lynch. Straight in the back. You don't mind hearing me? It's a function of where we are. I guess we're faster and faster. Good morning. May it please the court. My name is David Lynch, and I represent the plaintiff happily in this case. As indicated in our briefs, we believe that Illinois law applies to this transaction, and that's under the most significant contacts doctrine that Illinois courts follow. Counsel, let me ask you that, not to parse words initially, but why would Illinois law control when you have entered into a contract that specifically includes a choice of law provision and says New York controls the issue of whether or not the advance is valid? So why would Illinois' general law trump a contractual provision? Because I think we're dealing with issues that affect Illinois, obviously an Illinois mortgage, Illinois borrower. The contacts are primarily with Illinois. Although, as Your Honor will recall, we initially asserted that New York law applied. They argued that Illinois law applied, and we accepted that. They then changed their position and indicated that New York law applied. I don't believe that there is a significant difference between Illinois and New York law. Except for that statute in New York that, on the surface, is pretty broad. Well, no, on the contrary, I believe that statute is part of Chapter 17 of the Consolidated Laws of New York. And in the general provisions, it says unless otherwise – this is Section 1-1.5, which deals with the application of the rest of the statute. And it says unless otherwise stated therein, the provisions of this chapter – and that's Chapter 17, which includes the provision at issue. This chapter – I'm sorry. The provisions of this chapter apply to the estates and to instruments making dispositions or appointments thereof of persons living on its effective date or born subsequent thereto, etc. The statute is limited. It doesn't apply to, essentially, a business trust as was set up in this case. Is there a section of New York law that applies to a business trust? Not that I know of. If you look at the history of this particular provision, it was in a chapter – I think it was the real property law that was repealed in 1967 when the provision was put in the estate – what do they call it? Don't most statutory authorities have certain preambles that say when we talk about people, we also mean corporations? Is there anything like that? I don't believe there is, Your Honor. So you're saying it was intended to apply to testamentary conveyances and things like that, not business transactions? That's correct. Is that your position in general? That is my position. And so you're saying that the lawyers put in a choice of law provision, but there is no New York law that's applicable? There is no New York law that says a transacted provision is void. I'm not aware that there is a provision anywhere else in New York law. And there's a case, which I can cite to Your Honors, in the matter of Mary Chappelle, C-H-A-P-P-E-L-L. The court there said New York's estate – and the site is 883 New York Supplement, second 857. And I have copies for the court. New York's estates, powers, and trusts law generally applies only to those trusts created by persons living on or before – on or born after its effective date, September 1, 1967. So I think that the statute – That's a case law interpreting that you're saying? That's correct. All right. We will go back and forth, I suppose, for a while. I mean, you recognize detention because you have a choice of law provision in the contract. Yes. Which generally, ostensibly, has to be given some meaning. Or what would be the point of ever having one if the site is – of the transaction controls? But stepping aside, or away from that for a moment, why weren't – were the terms of the PSA complied with in this case? Yes. I recognize there's a problem with that. It could have perhaps been neater, but counsel glosses over and doesn't discuss the fact that it was dealt with. We filed a supplemental affidavit of Cecilia Boland. It was filed on April 11, 2011, as part of the reply in support of our motion for summary judgment and the response to defendant's cross-motion for summary judgment. And attached to that supplemental affidavit is a mortgage loan purchase agreement, which was between Heller Financial Capital Funding, Inc., which, if your honors will recall, that is the entity that was supposed to be selling the loan that would go into the trust. It was between Heller Financial Capital Funding, Inc. and Morgan Stanley Capital I, Inc., as the depositor. And in that mortgage loan purchase agreement, there was an appendix 2, which listed various loans that were going into the trust. And among them are the numbers 9 and 10 are the loans involved in this case. So, in fact, I believe that the PSA, or the Pullman Servicing Agreement, was complied with and that these loans became part of the trust. And, in fact, for 12 years, they were part of the trust. The payments were made by the borrower, and only when the borrower went into default, and then for some monthly payments, and then default when the loan matured. If I understand your position, then, by implication, you're saying we don't even need to get to the position of whether the conveyance was void or voidable, because your original position is, hey, this was in compliance with the PSA to begin with. Yes. That's correct. Is it – now, I ask this question without looking exactly at what you were looking at. Is it obvious that this transaction is properly placed in this trust? I believe so. By looking at that document. You have to read the provisions of the PSA, and it talks about purchase agreements. And you will then – if you do look at it, then you will see that, in fact, the loans went into the trust properly. Okay. So it's not confusing that it's – there are more than – there's more than one transaction going in or more than one loan going in or – Yes. That's not prohibited in any way by the PSA? I don't believe so. These pooling and servicing agreements, obviously, there are many loans from many sources that go into these pools. And we could all have a philosophical debate about whether commercial mortgage-backed securities are good or bad. In fact, this is what was happening at the time. The borrower obviously took advantage of it because he got his loans from this CMBS. Counsel, let me ask you another related question. You may be getting into it in a moment, but obviously I take it your position is the defendants don't have standing? Yes. Why is that? Because they're not parties to the agreement. I think it's clear in our brief. They're not a third-party beneficiary. The only one who has a right to enforce the contract is – are parties to the agreement or one who is a third-party beneficiary. With all due respect to Mr. Ashman, when he says that this was intended to be for their benefit, I suggest that is somewhat ludicrous to suggest that the lender would draft an agreement to which its borrower is not a party. In that agreement, they were trying – they were intending to create benefits for the borrower. I submit that isn't the case. I think it's clear that the provisions for the servicer to negotiate, etc., were provisions that were put in there for the benefit of the certificate holders. Clearly this – we have a borrower-lender relationship between the parties to this case, and there was no intent to benefit the borrower in that case. Well, there may not have been a specific intent. I mean, it says until your X amount of payments, you know, we're not doing anything, but we will attempt to negotiate litigation. It's last resort. What happens between I missed three payments and last resort? Wouldn't that – wouldn't anything that occurs there be of benefit to the mortgage debtor? If it was intended to benefit the borrower, theoretically you could say that the borrower had his third-party beneficiary rights. But I don't think the intent – that wasn't the intent to benefit the borrower. First of all, the provision for this three months or we won't talk to you, you must be in default for three months or we won't talk to you, that isn't in the pooling and servicing agreement. That was a statement allegedly made by somebody that worked for one of the servicers at the time. It is – it was uncontroverted in the trial court frame because that person is no longer with Brickadia. But certainly we don't believe that that bound the plaintiff. And more importantly, within those three months or pretty close to it, the loan matured. June 2010, the loan matured and wasn't paid. And there's nothing in the pooling and servicing agreement that would require us to essentially renew or rewrite or modify the loan. So that's really more what this is about, that the loan matured during the course of this trouble and then even – was it before the litigation was actually filed? No, the case was filed in mid to late May, I believe. June 1, it matured. So it's within weeks of the maturity of the loan. Correct. So then you're – I guess then the – not the philosophical, but the practical question is, why should we negotiate a loan that's now due in full? Correct. Okay. And there certainly – there was nothing in the record about discussions or negotiations after maturity. And even if there were these discussions or any discussion with the borrower about extensions or modification or renegotiation, then you get into the whole Illinois Credit Agreements Act, whether – – anything that was said orally. But there's no question whether anything was said. I got – I'm off track here. So our positioning is clear. Number one, they aren't entitled to enforce the provisions of the pooling and servicing agreement because they're not third-party beneficiaries, and we believe that does away with their argument that we didn't – basically that we didn't rewrite the loan or we didn't negotiate for rewriting the loan. Most importantly, I think, for our purposes today is the conveyance of the mortgages into the trust was accomplished by the loan purchase agreement, which, as I indicated, is Exhibit 2 to the supplemental affidavit of Cecilia Boland. And it was not otherwise prohibited by any statute or law. Correct. That's correct. You know, we have a situation here where this borrower, after many years, went into default, and even if he hadn't gone into default, couldn't pay the loan at maturity. I mean, that's an unfortunate situation that's happening and still happening all over the country. But the borrower has taken positions saying that we didn't do this, we didn't do that, we should do this, we should do that, none of which remedies the bigger problem here is why are we being portrayed as the bad guy here if there is a good and bad guy in these situations. We're entitled to be paid. We haven't been paid. The borrower then, through discovery, picks through a 300-page pooling and servicing agreement to which it is not even a party and says, well, you didn't comply with this provision and you didn't comply with that provision, which we say weren't for their benefit. And as a result of that, they apparently say that they don't have to pay the loan back or that we're not entitled to foreclose, and I submit that that's a ludicrous position at this point. Thank you. Thank you very much, counsel. Mr. Ashman? Yes. Thank you again. I'd like to touch on a few points. May I just ask first if you would reply to Mr. Lynch's statement that the terms of the PSA were complied with, that although, as he said, it could have been neater, but there was a conveyance into the trust of the mortgages by these documents and a plain reading of the documents, indeed, he said, or implied, certainly. It's inaccurate. For what reason is it inaccurate? Well, I want to direct the Court to specific pages in our brief that cites to the record, but I'll also summarize it. So if the Court wants to, when I'm done, take a look at our initial moving brief, our appellate brief, on pages 2, 3, and 4, there will be citations to the record of why that's inaccurate. But in summary, what happened was the mortgages at issue started with a company called Heller Financial, Inc. Heller Financial, Inc. assigned the mortgages to a company called Heller Capital Management, Inc. Neither of those two entities are mentioned in the PSA. They are not part of the PSA. The PSA provides that the seller pursuant to the PSA will be a separate company called Heller Financial Capital Funding, Inc. So according to the PSA, the seller of the mortgages is Heller Financial Capital Funding, Inc., and it has to go from that entity to Morgan Stanley Capital One, Inc. Neither of those two things occurred. What happened was, as I mentioned, it started with Heller Financial, Inc., and it went to Heller Capital Management, Inc., which was the second entity, and that entity gave directly to LaSalle Bank as trustee. So the two parties that are named in the PSA, the seller being Heller Financial Capital Funding, Inc., never held title, and the purchaser under the PSA, Morgan Stanley Capital One, Inc., also never held title. And instead, it went from another – now it's confusing because there's three separate Heller entities, but it's clear in our brief. I've tried to be clear articulating it, but it didn't go through the PSA. It went through and the record establishes that. Well, what is the document that Mr. Lynch alluded to? I'm not sure what he was alluding to. He alluded to some affidavit of somebody? There's an affidavit that had a conclusory statement that said we own the mortgages, which is a legal conclusion in any event as to whether there's ownership. That's what we're fighting about. So she, Cecilia Boland, who is an officer of the service provider, I didn't even know that she would have the ability to do it. That's what the draft affidavit said. He said something that I think is of substantial import here. Obviously, you believe you are alleging New York law applies. You've cited the statute, which on its face presents an impediment to the plaintiff's arguments. However, he then says, well, that's all well and good, but there's case law that make it clear. This applies to testamentary dispositions and trust. It has nothing to do with business transactions. What's your response to that? He says the statute's irrelevant to this transaction. Right. I just don't agree to that. You have the case law that says it to the contrary? If there was case law that said that it was illimited, we would have seen that. This issue of the New York trust is down at the court below. This isn't the first time we've raised this. And we've never seen any case law suggesting that it's so limited. Okay. And I'm sure if it was there, it would have been presented. We would have had an opportunity to review it. He cited a case, though, fitting that. Yeah. I mean, he said he cited a case, but he didn't. That case is cited for the first time now, and that's why he was going to hand it up. So I don't know what it says offhand. But I don't think it says that. It's limited to the trust amendment. Yeah, that businesses could not apply. I do want to add, though, that under New York law, a promissory note and a mortgage are considered to be personal property, not real property. And I have citations for that as well. And, in fact, I have all my citations, if the court would like, in a short supplementary brief I could hand out that will list everything we have. But according to the case law, it is personal property and, therefore, squarely fits within the definition of the statute. If I may just address one or two more quick points. Yes. The questions ‑‑ oh, he mentioned something with respect to the maturity of the loan. That's really not before the court. They sued on the breach before maturity. The complaint was never amended. The summary judgment was moved on that basis. What's before the court is the breach of the ‑‑ by lack of payment prior to maturity. I don't think the issue was ‑‑ it was because of that maturity. It was the breach. But your position was, and this is how it came about because I asked the question. If you feel there's a benefit to your client to accomplish a third‑party beneficiary status because there were these, as you understood them, negotiations after three months of, you know, no payments. And, therefore, your client was surprised without notice when, boom, sometime in the middle of May, the lawsuit was filed and there was no discussion about how we can refinance this. And that's how it came about. I asked the question. No, I understand how it came about. But the point is that there was a contractual obligation in order to engage in that, and they didn't do it. Where particular? Because Ms. Boland said that she would talk about it? No. I can give you the exact provision of the contract. Okay. If you take a look at page 5 of our moving brief, of our appellate brief, page 5 and 6 to the top of 7, it talks about those provisions. And, in particular, section 8.7A of the PSA. So there's a contractual obligation in order to engage in these discussions, which we mentioned in our paper. So I just want to mention that the issue before the court wasn't the loan maturity. That's not what they sued on. Also, he mentioned something about picking through the PSA out of a 400-page document as if these are just nits. These aren't nits. These are important provisions about whether the trustee has the mortgages at issue. So it's not something to be overlooked. The PSA was a heavily negotiated document. It is very long. It's incredibly complex and very sophisticated. And it provided with a specific ways and means to go about getting property in the trust. The trust has very important tax implications. If things are entered into the trust that do not comply with the PSA, it can throw off the tax consequences for all the beneficiaries. It's important that it's followed to the letter. And it's not a mere nit. And so either the mortgages are in the trust or they're not, and they're not in the trust. Now, maybe there might be a way subsequently to rowdy it, but it didn't happen. So it's not something to be glossed over as if these are unimportant rights. And the issue is, at this point, whether my client even has a say, because their position is that we can't even argue it. There's no standing to argue it. Now, maybe we would lose. I don't think so, because the record is clear, and I think our cross-cultural summary judgment should be granted. But at bare minimum, we have an opportunity to make the argument and have some standing. A party that has its rights affected and deprived through an entity that may not have any rights at all, I think at least due process requires that their voice be heard. Thank you. Thank you. Thank you for your arguments, counsel. We will take the argument under advisement, render a decision in due course, and we now stand in adjournment.